**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TASSOS EPICUREAN CUISINE, INC.,

        Plaintiff/Counter-Defendant,

v.                              Case No. 2:05-CV-71510-DT

TRIAD BUSINESS SOLUTIONS, INC. et al.,

        Defendants/Counter-Plaintiffs/
        Third-Party Plaintiffs,

v.

ANASTASIOS BOZADZIS,

        Third-Party Defendant.

                                       /

**FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND
APPLICATION OF FACTS TO THE LAW**

The matter is before the court for a bench trial "on the papers" pursuant to Federal Rule of Civil Procedure 50(a)(2). The parties have filed cross-motions for judgment, which have been fully briefed. Also pending before the court is an "Objection to Inclusion of Previously Unidentified Exhibits," filed by Plaintiff/Counter-Defendants' Tassos Epicurean Cuisine, Inc. ("TEC") and Anastasios Bozadzis.

## I. INTRODUCTION

Although this case has a complicated caption, with the assertion of various claims, counterclaims and third party claims, the central issue before the court is a determination of responsibility for a "top-heavy" penalty assessed against a multi-employer 401(k) plan administered by Defendants on behalf of TEC.

TEC initiated this action against Defendants Triad Business Solutions ("Triad"), Christopher F. Wardle, Matthew Bodo and Professional Practice Employment Solutions Group, Ltd. ("PPES").  In its initial complaint, TEC asserted claims for: (1) a breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 (Count I) and (2) Negligence under state law (Count II).  Defendants filed a counter-claim for breach of contract against TEC and Anastasios Bozadzis.  Because Bozadzis was not previously a party to this action, the court required, and the parties subsequently stipulated, that an amended counter-complaint be filed reflecting Defendants' assertion of a counterclaim against TEC and a third-party complaint against Bozadzis.  (*See* Dkt. ## 13-16.)  Thereafter, the parties stipulated to allow TEC to amend its complaint to add an additional claim for breach of contract and to clarify its allegations against Defendants.  (Dkt. ## 27, 28, 30.)  Finally, the parties stipulated to add an additional party, Professional Solutions, Inc., who was aligned as a Defendant/Counter-Plaintiff/Third Plaintiff.  (Dkt. ## 31 & 35.)

As the litigation has progressed, the parties have refined the pleadings and assertions such that, in TEC and Bozadzis's combined motion for judgment, the following relief is sought:

> A.  That a judgment be entered against Defendant Triad and Professional Solutions, Inc. in the amount of $ 16,275.71 plus pre and post litigation attorneys fees, interest and costs as a result of Defendants' alleged breach of a December 6, 2002 PEO Agreement.
>
> B.  That a judgment be entered against Defendant Triad and Professional Solutions, Inc. in the amount of $ 16,275.71 plus pre and post litigation attorneys fees, interest and costs as a result of Defendants' alleged negligent advice (or lack of advice) with respect to the adoption and administration of the Professional Solutions 401(k) Plan.

2

C.  That Defendants Wardle, Bodo and Professional Practice Employment Solutions Group, Ltd., be required to pay Plaintiff restitution in the amount of $ 16,275.71 plus pre and post litigation attorneys fees, interest and costs as a result of Defendants' alleged breach of fiduciary duty under ERISA.

(Pl.'s Mot. at 2.)  In response, Defendants[1] request that TEC and Bozadzis's motion be denied, and that, instead, the court enter a judgment in favor of Defendants and award pre and post litigation attorneys fees, interest and costs due to TEC's alleged breach of the PEO Agreement and Bozadzis's alleged guarantee of TEC's obligations under the PEO Agreement.

## II.  FINDINGS OF FACT

### A.  Relevant Stipulated Facts

The parties stipulated to most of the facts surrounding the causes of action.  The court accepts the following relevant stipulated facts as a portion of its findings of fact. Bozadzis and his wife have owned TEC since 1991.  (Stip. Fact 1.)  Defendant Christopher Wardle was the President and CEO of Professional Solutions, Inc, which was formed in 2000.  (Stip. Fact 3.)  Prior to forming Professional Solutions, Wardle was Triad's business manager.  (Stip. Fact 3.)  Triad ceased operations in or about December of 2002, but thereafter Wardle continued to use Triad's name and mark as a "d/b/a" for Professional Solutions.  (Stip. Fact 4-5.)

Defendant PPES is the plan sponsor of the Professional Solutions 401(k) Plan (the "Plan"), which was a multiple-employer plan originally created on January 17, 2000.

---

[1]For simplicity, when referring to Defendants/Counter-Plaintiffs/Third Plaintiffs collectively, the court will simply refer to them as "Defendants."

3

(Stip. Facts 6-7.)  Defendants Wardle and Matthew Bodo became the trustees of the Plan on August 28, 2003 with an effective date of January 1, 2003.  (Stip. Fact 8.)

Bozadzis enrolled TEC in a 401(k) plan with Vinova, LLC ("Vinova") in or about January 2000.  (Stip. Fact 9.)  The Vinova Plan was a single-employer plan for purposes of Internal Revenue Service testing requirements for top-heavy plans.  (Stip. Fact 10.)  Vinova was owned by Nicholas Fakaros,[2] Robert Coston, and John Bettin.[3] (Stip. Fact 11.)    Most of TEC's employees were Mexican and chose not to participate in the 401(k) program in favor of sending monetary support to their families in Mexico. (Stip. Fact 19.)  At some point prior to April 22, 2002, Vinova was notified by the Social Security Administration that several of TEC's employees had invalid social security numbers.  (Stip. Fact 17.)  In Bozadzis's deposition, he denied knowing that any of his employees were illegal aliens.  (Stip. Fact 20.)

The IRS issued a Revenue Procedure 2002-21 (the "Rev. Proc.") which took effect on May 13, 2002.  (Stip. Fact 21.)  Prior to the issuance of the Rev. Proc., Triad was the sponsor and PEO[4] of a single-employer 401(k) plan, and Professional Solutions was the PEO of a multi-employer 401(k) plan sponsored by PPES.  (Stip. Fact 22.)

Michigan Benefits Consulting ("MBC"), as a third-party administrator, monitored the daily technical issues, including Internal Revenue Code issues, for the 401(k) plans

---

[2]Bozadzis and Fakaros have been friends for years.  (Stip. Fact 16.)

[3]Bettin did not oversee any administration or handling of the Vinova 401(k) plan but merely looked over the quarterly reports to oversee the funds.  (Stip. Fact 14-15.)

[4]A PEO is a professional employer organization that handles the human resource functions of a small company including payroll, benefits, 401(k) plans and fringe benefits.  (Stip. Fact 49.)

of both Triad and Professional Solutions. (Stip. Fact 23.) Jennifer Richter was a qualified and experienced plan consultant for MBC. (Stip. Fact 24-26.) On or about September 5, 2002, MBC held a meeting with Defendants and advised them of the need to merge the Triad single-employer plan into the Professional Solutions multiple-employer plan due to the Rev. Proc. (Stip. Fact 28.) During the same meeting, MBC advised Defendants that they needed to present every employer enrolled in Triad's 401(k) plan with the option to either participate in the Professional Solutions multi-employer plan or terminate the existing plan. (Stip. Fact 29.) Subsequently, Defendants provided employers enrolled in the Triad single-employer 401(k) with the notices. (Stip. Fact 30.)

TEC was never enrolled in the Triad single-employer 401(k) plan, (Stip. Fact 31), and was never notified by Defendants of its options under the Rev Proc. (Stip. Fact 79.) TEC remained in the Vinova single-employer 401(k) plan until January 1, 2003. (Stip. Fact 33.) Bettin, a co-owner of Vinova, testified that Vinova was aware of the Rev. Proc. by 2002, but never informed TEC of the Rev. Proc. or its possible consequences to TEC. (Stip. Fact 32.)

In November 2002, Bettin and Wardle met to discuss a possible "merger"[5] of Vinova with Triad. (Stip. Fact 34.) On or about December 6, 2002, TEC entered into a professional employer organization agreement (the "PEO Agreement") with Defendant Triad upon recommendation of Fakaros.[6] (Stip. Fact 36-39.) Beginning on December

_____

[5]As will be discussed later, the parties dispute the meaning of the word "merger," as used to address the business relationship between Vinova and Triad.

[6]Bozadzis stated that he did not read the agreement because Fakaros told him that he did not need to read the document. (Stip. Fact 38.)

6, 2002, Wardle presented himself to TEC as the President of Triad and signed letters in that capacity despite the facts that Wardle was never President of Triad and that everything that was purportedly done on behalf of Triad was actually on behalf of Professional Solutions.[7]  (Stip. Fact 41.)  The PEO Agreement between Triad and TEC was actually intended by Wardle to be performed by Professional Solutions.  (Stip. Fact 47.)

As a PEO, Triad/Professional Solutions offered various services in relation to 401(k) plans, including plan administration, the withholding, the depositing and hiring a third party administrator to provide plan compliance.  (Stip. Fact 50.)  As part of its services, and pursuant to the PEO Agreement, Triad/Professional Solutions provided Plan materials, notices, educational opportunities, passed a census on to the third-party administrator for their technical functions and was the general administrator of human resources.  (Stip. Fact 53.)  In addition, Triad/Professional Solutions was also the payroll administrator and the sponsor of the plan, and provided advisors such as William Walsh, as well as pay for ancillary testing and compliance benefits.  (Stip. Fact 54.)  Triad/Professional Solutions also sends out newsletters to its clients regarding changes in the law with respect to 401(k) plans.  (Stip. Fact 55.)

Upon signing the PEO agreement Triad/Professional Solutions did not expect TEC to have any other agreement with any other PEO company.  (Stip. Fact 56.)  The Adoption Agreement for the Professional Solutions 401(k) Plan signed by Bozadzis had an effective date of January 1, 2003.  (Stip. Fact 60.)  On or about December 9, 2002,

---

[7]Not only did Wardle use Triad letterhead, but Triad and Professional Solutions also operated out of the same address and used the same fax and telephone numbers. (Stip. Fact 46.)

6

and on other occasions, Defendants informed Bozadzis that the Vinova single-employer 401(k) Plan would cease to exist on January 1, 2003, and informed Bozadzis of his need to adopt the Professional Solutions multiple-employer 401(k) Plan.  (Stip. Fact 57.) On or about December 20, 2002, the Vinova single-employer 401(k) Plan did not convert to a multiple-employer plan, but instead merged into the Professional Solutions multiple-employer 401(k) Plan.  (Stip. Fact 62-63.)  TEC's account balances from the Vinova 401(k) transferred over to the Professional Solutions 401(k) in or about May 2003.  (Stip. Fact 65.)  In either late December 2002 or early January 2003, John Bettin, Vinova's co-owner, became the COO of Professional Services.  (Stip. Fact 66.)

William Walsh was the financial advisor of the Plan, with duties including plan design, investment options, educational options, and continuing education as an advisor to the 401(k) plans.  (Stip. Fact 69.)  Walsh corresponded with clients using Triad/Professional Solutions's letterhead with permission from Triad/Professional Solutions.  (Stip. Fact 68.)  On June 30, 2003, Walsh sent correspondence to Bozadzis which Bozadzis may not have read.  (Stip. Fact 73-74.)

Defendant Wardle is the President and CEO of Professional Solutions, Inc.  He had a general understanding of what it means for a 401(k) plan to be rendered top-heavy, and of the differences between single and multiple-employer plans.  (Stip. Facts 75-76.)  In early 2003, Wardle was aware that there was low participation of non-key employees of TEC and the 401(k) plan.  (Stip. Fact 78.)  TEC continued under the Professional Solutions plan in 2003.  (Stip. Fact 80.)  On or about March 10, 2004, Triad/Professional Solutions sent TEC a letter stating that it owed a contribution in the

7

amount of $16,275.71 because its plan failed the top-heavy testing developed by the IRS.  (Stip. Fact 81.)  TEC paid the $16,275.71 top-heavy contribution.  (Stip. Fact 89.)

On April 26, 2004, Bozadzis gave verbal notice of termination of the PEO Agreement and, pursuant to a follow-up letter dated May 7, 2004, TEC terminated the PEO Agreement.  (Stip. Fact 84.)

### B. Additional Findings of Facts

In addition to the stipulated facts, the court makes the following additional findings of facts, which will be further analyzed in the court's application of facts to law in Section III, *infra.*

Neither Triad nor Professional Solutions are fiduciaries to the plan at issue. Rather, the court accepts TEC's unchallenged assertion that Triad and Professional Solutions are non-fiduciary third party service providers.

The PEO agreement required Triad and/or Professional Solutions to comply with "all rules and regulations governing administration, procurement and payment for any employee benefits covered by this Agreement."  (PEO Agreement at § 8.a.(7), Ex. 1.)[8] This requirement, however, did not include any obligation to notify TEC of the Rev. Proc.  Because TEC did not have a plan with Defendant Triad/Professional Solutions on May 13, 2002, there was no affirmative duty for Triad to notify TEC of the Rev. Proc. Additionally, the Rev. Proc. only requires PEOs to notify companies who were enrolled in a single-employer 401(k) plan.  Because there was no duty imposed on Triad by the Rev. Proc., then was no breach of the PEO Agreement.

---

[8]The parties submitted joint exhibits.  Unless otherwise noted, "Ex." will refer to a joint exhibit.

Moreover, the Triad/Professional Solutions Multiple Employer 401(k) Plan became effective on January 1, 2003. Any contractual duty to inform TEC of the Rev. Proc. did not arise, at the earliest, until January 1, 2003, well after Triad had sent the required notice to its single-employer plans. Finally, Section 31 of the agreement specifically states that "the benefit plans itemized below are available generally to all co-employees on TRIAD's payroll, unless provided separately by the client. Only the ones specifically marked will be available to work-site employees through this agreement." The court finds that the Vinova plan was provided for separately and not covered by the agreement. The PEO agreement did not create a contractual duty for Triad or Professional Solutions to provide notice of the Rev. Proc. to TEC.

Vinova, who is not a party to this action, breached its duty to notify TEC of the Rev. Proc. However, Professional Solutions is not liable for Vinova's breach. There was no "merger" between Professional Solutions and Vinova to give rise to successor liability. It was merely the plans that merged, not the PEOs. There is no evidence that Professional Solutions actually took control of Vinova. Instead, Professional Solutions was granted access to Vinova's client list and created new contracts with whichever clients were willing. (Wardle Dep. at 51, Ex. 42.) TEC has not met its burden of proof that Vinova merged with Professional Solutions (or Triad) merely because Vinova allowed access of its client list to Professional Solutions.

Triad and Professional Solutions owed no duty to TEC that is not contemplated by the PEO Agreement. TEC has not established that a duty separate and distinct from the PEO Agreement was owed to TEC. Moreover, any breach of a common law duty would have to be weighed against TEC's conduct. Bozadzis did not read many of the

9

documents provided to him by Professional Solutions.  (Bozadzis Dep. at 45-46, Ex. 41.)  In December of 2002, William Walsh, the financial advisor to the Triad/Professional Solutions plan advised Bozadzis to adopt a "safe harbor format."  Bozadzis chose not to do so because he claimed that he could not afford it.  (Walsh Dep. at 53, Ex. 40.)  In addition to this advice, Walsh told Bozadzis to refrain from making contributions to the Plan for 2003 or the Plan would likely be top-heavy.  (*Id.* at 53-54.)  Bozadzis ignored the statement and continued to contribute to the Plan.  Even after Bozadzis received notice that the Plan was top-heavy, he continued to make contributions.  (ING Access Report, Ex. 43.)

Bozadzis suffered no damages in relation to the top-heavy penalty, and Defendants Wardle, Bodo and Professional Practice Employment Solutions Group, Ltd. did not breach any fiduciary duty owed to Bozadzis under ERISA.  TEC is not a plan participant or beneficiary, and was therefore owed no duty of fiduciary duty. Nonetheless, even if a duty were owed, Defendants did not breach any fiduciary duty owed to TEC.

### III.  CONCLUSIONS OF LAW AND APPLICATION OF FACTS TO LAW

As a preliminary matter, the court finds that TEC's state law claims of negligence and breach of contract are not preempted by ERISA.  "ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.' *Penny/Ohlmann/Neiman, Inc. v Miami Valley Pension Corp.,* 399 F.3d. 692, 697 (6th Cir. 2005) ("PONI") (citing ERISA § 514(a), 29 U.S.C. § 1144(a)).

In order to determine if a state law claim is preempted by ERISA, a court must go beyond the terms of the statute and evaluate the objectives of the ERISA statute to

determine the scope of preemption. *Id.* at 698 (citing *New York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.,* 514 U.S. 645, 655 (1995)). "The purpose of ERISA preemption was to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans." *Id.* ERISA generally preempts three types of state laws: those that "'(1) mandate employee benefit structures or their administration,' (2) provide 'alternate enforcement mechanisms,' or (3) 'bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.'" *Id.* (quoting *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1468 (4th Cir.1996)). However, ERISA does not preempt state law claims "when brought against non fiduciary service providers in connection with professional services rendered to an ERISA plan." *Id.* (citations omitted).

Triad and Professional Solutions argue that TEC's state law claims are preempted by ERISA because the claims allegedly seek to circumvent ERISA's enforcement mechanisms. Triad and Professional Solutions further contend that Defendant PPES was the employer of the plan and therefore was a traditional plan entity, which implicates ERISA's preemption rules. However, TEC brought its state law claims, not against PPES, but against Triad and Professional Solutions, who are not fiduciaries to the plan. Rather, as TEC asserts (and as neither Triad nor Professional Solutions refute) Triad and Professional Solutions are third-party service providers. Under *PONI*, state law claims are not preempted "when brought against non fiduciary service providers in connection with professional services rendered to an ERISA plan."

11

*PONI*, 399 F.3d. at 698.[9]

## A. Breach of Contract

TEC first asserts a breach of contract action against Defendant Triad and Professional Solutions, Inc. in the amount of $ 16,275.71 plus pre and post litigation attorneys fees, interest and costs as a result of Defendants' alleged breach of the December 6, 2002 PEO Agreement.  Specifically, TEC argues that Defendant Triad/Professional Solutions breached the December 6, 2002 contract when it failed to notify TEC of the Rev. Proc.  Alternatively, TEC argues that, even if Defendants did not have a duty to notify it of the Rev. Proc., then they nonetheless are liable for Vinova's failure to notify TEC because there was a merger between Triad/Professional Solutions and Vinova and Triad/Professional Solutions therefore assumed Vinova's liabilities.  The court disagrees with both of TEC's arguments.

### 1.  Defendants had no responsibility to notify TEC of the Rev. Proc.

TEC cites Section 8.a.(7) of the PEO agreement in which Triad[10] agreed to comply with "all rules and regulations governing administration, procurement and payment for any employee benefits covered by this Agreement."  (PEO Agreement, § 8.a.(7), Ex. 1.)  Section 31 of the agreement lists 401(k) retirement plans as one of the

---

[9]Further, the ERISA preemption issue is a moot issue inasmuch as the court finds below that TEC is not entitled to relief on its state law claims.

[10]Because of the ambiguous overlap between Triad and Professional Solutions, TEC brings its breach of contract action against both entities. The parties agree that it was Triad who entered into the PEO Agreement with TEC, but that Wardle intended the PEO Agreement to be performed by Professional Solutions.  (Stip. Fact 47.)  The court need not determine who would be liable for a breach, because the court ultimately finds that no breach occurred.  Following the parties' lead, for purposes of both the breach of contract analysis and the negligence analysis, the court will refer to Triad as either Triad/Professional Services or, simply, Triad.  The court's findings in these sections, however, apply to both entities.

benefits covered by the agreement.  (*Id.* at § 31.)  TEC alleges that the language contained in those specific provisions of the PEO agreement imposed an affirmative duty on Triad to notify TEC of the IRS Rev. Proc.

There is no dispute between the parties that Triad did not notify TEC of the Rev. Proc.  Rather, the dispute is over whether Triad had a duty to inform TEC of the Rev. Proc. at all.  Under Michigan law, "[t]o establish a breach of contract, a party must show . . . (1) the existence of a valid contract or agreement, and (2) the non-performance of a duty, whether imposed by a promise stated in the contract or by a term supplied by the court."  *Hesse ex rel. Estate of Hesse v. Chippewa Valley Schools,* No. 209080, 2001 WL 789540, *2 (Mich. Ct. App. Jan. 12, 2001) (*Woody v. Tamer,* 405 N.W.2d 213 (Mich. Ct. App. 1987)); *see also  Lamb v. University Musical Soc.,* No. 253312, 2005 WL 857384, *1 (Mich. Ct. App. Apr. 14, 2005) ("The elements of a breach of contract cause of action are that a contract existed between the parties and that a breach of one or more of the contractual terms occurred.") (citing SJI2d 140.01; *American Parts Co, Inc v American Arbitration Ass'n,* 8 154 N.W.2d 5 (Mich. Ct. App.1967)).  In this case, the existence of a valid contract is not in dispute.  The court must only determine whether there was a non-performance of a duty.  As the Michigan Court of Appeals has stated, "[n]on-performance is not a breach unless performance is due."  *Woody,* 405 N.W.2d at 216 (citations omitted).

Under Rev. Proc. 2002-21, employers who participated in a single-employer plan that was in existence as of May 13, 2002, were entitled to notice of various options from the PEO.  The Rev. Proc. provided that the PEO was required to send the notice by May 2, 2003.  (Rev. Proc. 2002-21 § 5.02(2) & § 4.02(2).)   The court finds that these

13

dates, which are undisputed by the parties, are dispositive of Triad's duties under the Rev. Proc. and, consequently, under the PEO Agreement.

At the time when the Rev. Proc. was issued, TEC was enrolled in a single-employer 401(k) plan, sponsored by Vinova.   Rev.Proc. 2002-21 only applies "[i]f a PEO has a PEO Retirement Plan in existence on May 13, 2002, that benefits Worksite Employees."  (Rev. Proc. 2002-21 § 4.01.)   On May 13, 2002 TEC maintained a plan only with Vinova.  TEC was not, at any point, enrolled in a Triad Single Employer 401(k) Plan  (Stip. Fact 31.)  Instead, TEC remained in the Vinova single-employer 401(k) plan until January 1, 2003,  (Stip. Fact 33), at which time the Vinova plan merged into the Professional Solutions multiple-employer 401(k) plan, (Stip. Fact 63).  Because TEC did not have a plan with Defendant Triad/Professional Solutions on May 13, 2002, there was no affirmative duty for Triad to notify TEC of the changes.  Additionally, the ruling only requires PEOs to notify companies who were enrolled in a single-employer 401(k) plan.  As both parties concede, in the fall of 2002, Triad notified each of the companies that maintained single-employer 401(k) plans with them as of May 13, 2002.  (Stip. Fact 30.)  TEC, however, did not maintain such a plan with Triad and therefore Triad was under no duty to send to TEC any notice required by the Rev. Proc.[11]

If there was no duty imposed on Triad by the Rev. Proc., then there can be no breach of the PEO Agreement.  Section 8 obligates Triad to comply with "all rules and regulations governing administration, procurement and payment for any employee

---

[11]The court is not persuaded by TEC's argument that, since the Rev. Proc. required that the notice be sent by May 2, 2003, Triad was under a duty to send the notice to any plan in its management up until May 2, 2003.  It is the starting point, or the date identified by the Rev. Proc. as the trigger date, which is controlling, rather than the date by which the notice had to be given.

benefits covered by this Agreement." (PEO Agreement, § 8.a.(7), Ex. 1.) Since the court finds that Triad complied with the Rev. Proc. with respect to TEC (as Triad was not required to send notice to TEC under the Rev. Proc.), Triad did not breach Section 8 of the PEO Agreement.

Moreover, TEC did not sign an agreement with Triad/Professional Solutions until December 6, 2002. It was not until January 1, 2003 that the Triad/Professional Solutions Multiple Employer 401(k) Plan became effective. Any contractual duty to inform TEC of the Rev. Proc. did not arise, at the earliest, until January 1, 2003, well after Triad had sent the required notice to its single-employer plans. Moreover, Section 31 of the agreement specifically states that "the benefit plans itemized below are available generally to all co-employees on TRIAD's payroll, unless provided separately by the client. Only the ones specifically marked will be available to work-site employees through this agreement." Triad/Professional Solutions is correct that it was only responsible for benefits provided by the agreement, and the Vinova plan was provided for separately and not covered by the agreement. The PEO agreement did not create a contractual duty for Triad/Professional Solutions to provide notice of the Rev. Proc. to TEC.

Under the terms of the Rev. Proc., Vinova had the only duty to provide notice to TEC. Because there was nothing in the PEO Agreement that obligated Triad/Professional Solutions to administer the Vinova plan, TEC's argument that Triad had almost six months after signing the PEO Agreement to issue the notice is irrelevant. Also, TEC's argument that correspondence sent to TEC from Triad/Professional Solutions acknowledging the Rev. Proc., but not discussing the notice required by the

15

Rev. Proc. is also irrelevant.  Because TEC should have already received the notice

from the PEO that serviced the single-employer 401(k) plan, Triad could have

reasonably assumed that TEC already knew about the Rev. Proc.[12]  The simple fact is

that neither the Rev. Proc. nor the PEO Agreement created an affirmative obligation to

send TEC the specified notice under the Rev. Proc.  Thus, TEC has failed to meet its

burden that either Triad or Professional Solutions breached the PEO Agreement.

### 2. Professional Is Not Responsible for Vinova's Liabilities

As stated above, at the time the Rev. Proc. was issued, TEC was still enrolled in

the Vinova 401(k) program and Vinova had a duty to notify TEC of the Rev. Proc.  John

Bettin, the co-owner of Vinova, stated in his deposition that he was aware of Vinova's

obligation to notify TEC of the change in law and top heaving testing.  (Bettin Dep. at

32-33, Ex. 37.)  Vinova, however, never informed TEC of the Rev. Proc. or its possible

consequences to TEC.  (Stip. Fact 32.)  Thus, Vinova, who is not a party to this action,

breached its duty to notify TEC.  TEC argues, however, even if the PEO Agreement did

not create a contractual duty to notify TEC, Professional Solutions is nonetheless liable

for Vinova's failure to notify TEC of the Rev. Proc. because there was a "merger"

between Professional Solutions and Vinova.  TEC asserts that because of the merger,

Triad/Professional Solutions acquired Vinova's liabilities as well as its assets.[13]

---

[12]Further, because Triad did not have a duty to notify TEC of the Rev. Proc., it is also irrelevant whether Triad made such an assumption or whether that assumption was reasonable.

[13]The court is somewhat unclear as to why this argument is included under TEC's "breach of contract" theory, rather than a separate successor liability theory. Nonetheless, because Defendants do not appear to take issue with TEC's presentation fo the issue, the court will address it.

While TEC has presented some evidence to suggest that there was some contemplated affiliation between Triad and Vinova, the evidence does not establish that Vinova was acquired by Triad/Professional Solutions. Rather, the court is persuaded by Triad/Professional Solutions's evidence that it was merely the plans that merged and not the PEOs.[14] There is no evidence that Professional Solutions actually took control of Vinova. Wardle testified that Professional Solutions did not acquire Vinova's assets. (Wardle Dep. at 14, Ex. 42.) Instead, Professional Solutions was merely granted access to Vinova's client list and created new contracts with whichever clients were willing. (*Id.* at 51.) Professional Solutions would have only been responsible for notifying TEC of the change if there was a merger of Vinova and Triad/Professional Solutions that would have given rise to successor liability. In fact, at the time of his deposition, Wardle was not even sure when or if Vinova ceased its operations. (*Id.* at 109.)[15] TEC has not met its burden of proof that Vinova merged into Triad/Professional Solutions merely because Vinova allowed access of its client list to Professional Solutions.

The entire essence of a merger is that the successor corporation acquires the assets of the target corporation and either dissolves the target or controls it. The

---

[14]In Defendants' Response and Motion for Judgment they address this point by citing the relevant contract. (*See* Defs.' Br. at 16-17.) The court has reviewed the "Plan Merger Instrument," and is persuaded that its language supports Professional Solutions's position that it was merely the plans that merged. Not only does the title of the document reinforce this conclusion, but the terms of the document itself specify that "[a]ll assets and liabilities of the First Plan and Trust hereby become assets and liabilities of the Surviving Plan and Trust." (Ex. 22.) TEC does not argue, or provide any evidence, that (1) it was the Vinova Plan, rather than Vinova itself, which was liable for failure to provide notice of the Rev. Proc. or (2) Professional Solutions should be held liable for any liabilities of the Professional Solutions Plan.

[15]It appears that Vinova is still an active LLC. (Defs'. Ex. 46.)

successor liability rule looks closely to the transaction between the acquiring corporation and the target corporation. *Foster v. Cone-Blanchard Machine Company,* 597 N.W.2d 506, 509 (Mich. 1999). As the Michigan Supreme Court has held:

> If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities. However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies.

*Id.* The court need not analyze the exceptions as they apply to the facts of this case because there was no assumption of Vinova's assets and thus no merger.

TEC has not satisfied its burden of proof to demonstrate that Professional Solutions merged with Vinova and assumed Vinova's liabilities. Without a merger, there can be no successor liability. If the shareholders in Vinova chose to cease operations, it was not because Professional Solutions acquired Vinova. They remained separate entities. TEC's argument fails because the only evidence before the court is that there was a merger merely of the plans, not a merger of the companies. Triad/Professional Solutions did not assume Vinova's liabilities.

### B. Negligence

Plaintiff next asserts a negligence count against Defendants Triad and Professional Solutions. It is well-established that a prima facie case of negligence requires a plaintiff to prove four elements: duty, breach of that duty, causation and damages. *Fultz v. Union-Commerce Associates,* 683 N.W.2d 587, 590 (Mich. 2004). Here, as with TEC's contractual claim, the court finds that TEC has failed to establish by a preponderance of the evidence that Triad or Professional Solutions breached any duty

18

to TEC.  Specifically, the court finds that Triad/Professional Solutions did not owe TEC

any duty apart from that which arose in contract.

Michigan law provides that if a party voluntarily enters into an agreement to

perform an act without having a prior obligation to do so, "a duty may arise to perform

the act in a nonnegligent manner."  *Futlz,* 683 N.W.2d at 591 (citations omitted.)  If a

defendant does not perform or refuses to perform a promise, then the action is in

contract.  *Id.* at 591.  Indeed, "a tort action will not lie when based solely on the

nonperformance of a contractual duty."  Instead, if a defendant performs a contractual

duty negligently or breaches a duty that arose implicitly from the relationship of the

parties created by the contract, the action may be in either contract or tort.  *Id.*

However, there can be no tort action for the misfeasance of a contractual obligation

unless there is a violation of a duty that is "separate and distinct from the contractual

obligation."  *Id.* at 592 (citation omitted).

In *International Harvester Credit Corporation v. Wilkie,* 695 F.2d 231, 234 (6th

Cir. 1982), the Sixth Circuit held that the duty of an insurance company to remit an

unearned premium was not a duty that existed in common law nor was it separate and

distinct from the contractual undertaking.   The court held that under Michigan

precedent, "a viable tort action must predicate upon a breach of duty distinct from the

breach of contract and predicate upon active negligence or misfeasance; no tort action

can be founded upon nonfeasance in the performance of a contract."  *Id.* (citing *Hart v.

Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956)); *Garden City Osteopathic Hospital v.

HBE Corporation,* 55 F.3d. 1126, 1134 (6th Cir. 1995) ("Michigan law 'is well-settled that

an action in tort requires a breach of duty separate and distinct from a breach of

19

contract.'") (quoting *Brock v. Consolidated Biomedical Lab.*, 817 F.2d 24, 25 (6th Cir. 1987)).  In *Garden City Osteopathic Hospital,* the court analyzed the duty of care that is separate from a contract but arises out of a contractual relationship.  55 F.3d. at 1134. If there is a contractual relationship, that contract must only create the relationship that gives rise to the common law duty to exercise ordinary care.  *Id.*  In order to sustain a tort of negligent performance of a contractual duty, there must be a relationship that would provide for a legal duty without enforcing the contract.  *Id.*

TEC argues that Triad/Professional Solutions had a separate and distinct duty which arose from Professional Solutions holding itself out to the public as an expert in administrative services and 401(k) plans. (Pl.'s Mot. at 16.)  TEC has not offered any evidence or authority to support this theory, and it is not self-evident how this would create a separate and distinct duty from the contract.  It would appear that, under TEC's theory, Triad/Professional Solutions would be liable to anyone who read their advertisements.  It is not the solicitation of customers, but the formation of a contractual relationship that imposes a duty on Triad/Professional Solutions.  Without the contract, there is no relationship between parties that would give rise to a legal duty.

The cases TEC cites are inapposite.  TEC first cites a Michigan Supreme Court case which held an electric company negligent for failing to inspect and repair electric wire that caused an individual to be electrocuted while painting a house.  *Schultz v. Consumer Power Company,* 506 N.W.2d 175 (Mich. 1993).  The court based its decision on the fact that electricity was inherently dangerous and the utility company therefore owed a duty to the general public.  TEC also cites *Buczkowski v. McKay,* 490 N.W.2d 330, 334 (Mich. 1992), where the court declined to impose a duty on a retailer

20

to protect the public from any risk arising out of the purchase of ammunition.  The court stated, "[w]hether a retailer has a duty to protect a member of the general public from the criminal act of a customer depends on the relationship between the parties, the nature and foreseeability of the risk, and any other considerations that may be relevant on the issue."  *Id.*  Neither of these cases involved situations where the parties' relationship arose out of a contractual agreement, but involve ordinary negligence analysis. Moreover, both cases reinforce the proposition that a plaintiff must identify a specific duty in order to sustain a negligence cause of action.

TEC did not cite any authority to carry its burden of proof that Triad/Professional Solutions' alleged act of holding itself out to the public as a specialist in a business sector created a separate and distinct duty.[16]  Rather, the only basis for a relationship between the TEC and Defendant Professional Solutions was the PEO agreement. Defendant Professional Solutions did not act negligently because it did not breach the contract it had with TEC, nor was there any separate and distinct duty giving rise to an action in tort.[17]

---

[16]The court is also not persuaded by TEC's argument that Triad's June 30, 2003 letter stating that it is "trying to identify the clients most at risk of failing," (Ex. 5), created any additional duty, separate and distinct from those duties contractually imposed under the PEO Agreement.

[17]Finally, the court notes that even if TEC had established that Triad/Professional Solutions breached a duty giving rise to a negligence action, the court would nonetheless hold TEC and/or Bozadzis at least partially responsible for that breach. Bozadzis admittedly did not read many of the documents provided to him by Professional Solutions.  (Bozadzis Dep. at 45-46.)  Further, the court is persuaded by the testimony of William Walsh, the financial advisor to the Triad/Professional Solutions plan, who advised Bozadzis to adopt a "safe harbor format."  Bozadzis chose not to do because he claimed that he could not afford it.  (Walsh Dep. at 53, Ex. 40.)  In addition to this advice, Walsh told Bozadzis to refrain from making contributions to the Plan for 2003 or he would likely be top-heavy.  (*Id.* at 53-54.)  Bozadzis ignored the statement and continued to contribute to the Plan.  Even after Bozadzis received notice that the

## C.  ERISA Breach of Fiduciary Duty

In TEC's final claim, it asserts a breach of fiduciary duty count against

Defendants Wardle, Bodo and Professional Practice Employment Solutions Group, Ltd.

("PPES").  Under 29 U.S.C. § 1132(a)(3), a civil action may be brought "by a participant,

beneficiary, or fiduciary . . . to obtain other appropriate equitable relief (i) to redress

such violations or (ii) to enforce any provisions of this subchapter or the terms of the

plan."  TEC argues that PPES, Wardle and Bodo:

> breached their fiduciary duty of loyalty to this plan participant (*Bozadzis*)
> when they failed to fully inform this participant of his options under the
> plan and when they failed to fully disclose complete and accurate
> information to this participant as to the consequences to his employer,
> TEC, if the plan was determined to be top heavy.

(Pl.'s Mot. at 21 (emphasis added).)  The fundamental flaw in TEC's argument is that it

alleges a breach of fiduciary duty to the participant, who is not a plaintiff in this litigation.

TEC cites no case law which allows an employer, who is not a participant or beneficiary,

to bring a cause of action on behalf of or in lieu of the participant.  Moreover, it was

TEC, not Bozadzis, who paid the $16,275.71 top-heavy contribution.  (Stip. Fact 89.)

Thus, even if TEC could bring a cause of action on behalf of Bozadzis, there is no

evidence before the court that Bozadzis is entitled to any form of equitable relief, let

---

Plan was top-heavy, he continued to make contributions until June 2004.  (ING Access
Report at 9, Ex. 43.)  Bozadzis's conduct in ignoring the advice of Walsh and continuing
to contribute would reduce or eliminate the liability of Triad/Professional Solutions, if the
court were to find that Triad had been negligent.

alone the "restitution" which TEC seeks.[18]  TEC's fiduciary duty claim must therefore

necessarily fail.

### D.  Defendants' Counterclaim Against TEC and Third-Party Action Against Bozadzis for Breach of Contract

Defendants assert a counterclaim against TEC and a third-party complaint

against Bozadzis for breach of contract.  As TEC points out, Defendants' initial breach

of contract claim was based upon an alleged failure of TEC to grant Defendants access

to its employees.  However, in its motion for judgment, Defendants premise the alleged

breach on a different contractual provision, as supported by a different set of proposed

facts.  TEC argues that, under the terms of the contract, Defendants cannot bring their

new theory without first making a "reasonable request," and there is no evidence

Defendants made such a request.  (Pl.'s Reply at 12.)  Defendants do not dispute this

assertion, but instead argue that they are allowed to "raise any prior breach as a

defense to the Plaintiff's claim."  (Defs.' Reply at 17.)  Defendants, therefore, are now

pursuing their breach of contract theory only as a *defense* to Plaintiff's action, rather

than as an affirmative cause of action.  Indeed, Defendants argue that Bozadzis

committed the first material breach, which bars his contract claims.  (Defs.' Reply at 20.)

Moreover, Defendants' entire breach of contract argument is based on the preliminary

---

[18]Further, even if Bozadzis were a plaintiff to this action, the court is not persuaded by the facts presented that Defendants breached any fiduciary duty to Bozadzis.  As discussed above, Triad/Professional Solutions, or its agents/employees, were not obligated to take any action under the Rev. Proc. or the PEO Agreement to notify TEC or Bozadzis of the details of the Rev. Proc.  Nor has TEC established that Defendants lied or otherwise deceived Bozadzis.  Rather, the court finds that Walsh specifically advised Bozadzis to adopt a "safe harbor format" and to refrain from making contributions to the Plan for 2003 or he would likely be top-heavy. (Walsh Dep. at 53-54, Ex. 40.)

finding that Triad suffered damages.  (*See* Defs.' Mot. at 28 ("If TRIAD suffers damages

. . . TEC will owe those damages to TRIAD.").)  Because the court has found against

TEC on all of its claims, the court is not persuaded that Triad has suffered damages.

Accordingly, the Defendants have failed to meet their burden of proof on their

counterclaim and third party claim for breach of contract.

## IV.  CONCLUSION

For the reasons stated above, the court finds that none of the parties have met

their burden of proof on the claims asserted in this action.  Accordingly,

IT IS ORDERED that Plaintiff/Counter-Defendant/Third-Party Defendant's

"Motion for Judgment" [Dkt. # 44]  is DENIED, and Defendants/Counter-Plaintiffs/Third-

Party Plaintiffs' "Motion for Judgment"  [Dkt. # 46] is GRANTED IN PART AND DENIED

IN PART.  Judgment will be entered in favor of Defendants on the claims raised in

Plaintiffs' amended complaint and in favor of Counter-Defendant and Third Party

Defendant on the claim raised in Defendants' counter-complaint and third-party

complaint.

Finally, because the court has not relied on Defendants' Exhibits 53 or 54 in its

analysis, IT IS ORDERED that Plaintiff's "Objection to Inclusion of Previously

Unidentified Exhibits" [Dkt. # 49] is OVERRULED AS MOOT.


      S/Robert H. Cleland               
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  March 28, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, March 28, 2007, by electronic and/or ordinary mail.

      S/Lisa Wagner                  

Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\05-71510.TASSOS.Rule50.2.wpd